Good morning, Your Honors. May it please the Court, Brian Hofstad and P.O. Kim on behalf of the United States. Mr. Kim will address any of the issues on the Consolidated Fee Appeal, and with the Court's permission, unless the Court has a different preference, I'll address both the issues on appeal and cross-appeal while I'm speaking right now. With respect to the appeal in this case, the Government believes that the District Court erred in granting summary judgment on the Counterfeit Cigarette Trafficking Act claim. In a nutshell, the Government's claim was that the cigarettes in this case were subject to the California state tax, and because they were unpaid, were deemed to be contraband within the meaning of the CCTA. The District Court, in this case, concluded that the cigarettes in this case were not subject to the California state tax, and also based its reasoning in part on the fact that the California law was preempted because these cigarettes were placed in a Federal enclave called a foreign trade zone. The Government believes that the District Court respects, with respect to its ruling. As an initial matter, the cigarettes in this case were subject to the California distribution tax. That's because the tax is imposed upon either sale or use or consumption, and use or consumption is defined by the statute as the exercise of any power or right over the cigarettes incident to the ownership thereof, except the keeping of those cigarettes pending sale by a licensed distributor. And in this case, Intrigue was not a licensed distributor. And what this language means is that if someone is unlicensed, that that does fall within the meaning of use and consumption, and therefore, the cigarette tax applies. The California state statutes also make it clear that the tax is imposed on cigarettes even if they're ultimately going to be sold in a different State. And we can infer that from the statutory scheme, because the statutory provisions provide for a refund for certain types of distribution tax as to tobacco products when they're actually sold out of State. So the California State legislature has actually contemplated that cigarettes held by an unlicensed distributor, even for sale in a different State, are going to be subject to the tax. Intrigue argued below, and argues in this Court as well, that it was in joint possession of these cigarettes with its sister company, NTI, which was a licensed distributor. The government believes that this argument doesn't work both factually and legally. It doesn't work factually, because the record indicates only that NTI paid the rent for the space in the Federal trade zone. Other than that, Intrigue owned the cigarettes the entire time. They In fact, Intrigue, when it wanted to actually put stamps on cigarettes, went through the legal transaction of selling the cigarettes from Intrigue to the licensed distributor, NTI. And most importantly, the Board of Equalization, the California State Taxing Authority, viewed the two entities as being separate. It issued a license only to NTI. It had no DBA or otherwise known as name for NTI working also as Intrigue. And the license, if you look at the excerpts of record at 105 for Intrigue, or excuse me, the license for NTI, says that the license is nontransferable. So in that circumstance, the taxing authority certainly viewed these as two separate entities and not as the possession as being joint. More as a legal matter, the joint possession argument doesn't work, because as we cited the cases Carrasco and the miscellaneous firearms case, the fact that a piece of contraband is jointly possessed by someone who's allowed to have it and not allowed to have it doesn't somehow negate the fact that the prohibited person is still possessing that contraband. And that's what we have in this case. Moreover, the adopting that rule, this kind of joint possession rule in this case, would largely frustrate the purpose of the California scheme. California set up kind of an either-or scheme. If you're a licensed distributor, you can possess cigarettes in certain circumstances. For instance, if you're – if they're pending sale or if you're purchasing them from the original importer or from the – directly from the manufacturer, where you don't have to pay taxes on them. But licensed manufacturers – licensed distributors are required to actually – to report and open their books up. And they have those types of obligations so that the state authorities can see what they're doing and can watch. Did RFI report and open books up on the – the cigarettes that were found in the entry trading compartment of this free trade zone? The record indicates that they did not. The only – the record – the only portion of the record that addresses this issue is a statement that was made in the course of the hearing regarding the motion. And in that hearing, the government represented that NTI had not reported those cigarettes to the California state taxing authorities. And that went unchallenged insofar – I mean, I believe that's the only reference in the record. Is the – is it the – I know – now, is Mr. Kim addressing the suppression issue? No, I'm going to address the suppression issue before you, Your Honor. Okay. Well, on that, is it your position that the government has the right to just – it got that right out of the suspicious circumstances in this case? The government's position is that the initial seizure and sampling of the 12 cartons is justified either on two bases. I mean, the government's primary basis is that intrigue had no reasonable expectation of privacy in that area because of the heavy customs regulation. Because it is in the free trade zone. Because it's in the foreign trade zone. And the statutes and regulations with respect to those indicate that customs – you know, that domestic merchandise such as that in this particular case is within customs supervision. The statute actually says that, 81CA. And also, the regulations that govern it provide that intrigue – or that customs has the authority to inspect merchandise that's being housed there. And so the government's initial position is that there is no reasonable expectation of privacy. Intrigue resists that on the notion in its reply brief that customs didn't really regularly exercise that authority and somehow lost its legal authority to do so. The government doesn't feel that that argument works, both because as a factual matter, the record indicates that during the time period at issue, customs actually came by two or three times a year to look at the various cigarettes that were – or to inspect the foreign trade zone. And, in fact, looked at cigarettes during some of those inspections. I would hope customs is inspecting what's in the foreign trade zone. Right. I mean, in fact, the cigarette intervention team that found the cigarettes in this case was exercising that authority. It was, you know, entering into the premises where it had a lawful right to be and inspecting. And, moreover, the – so that's why the government believes that there is no reasonable expectation of privacy there. Moreover, customs' failure to exercise its authority doesn't somehow cause it to lose its legal authority. Congress and the statutes have clearly – and the regulations have clearly given customs this ability to do – to exercise this authority. And so we think there's no reasonable expectation of privacy. In the alternative, Your Honor, we argue that even if there were some sort of Fourth Amendment interest implicated, that there was ample probable cause, given the various suspicious circumstances under which customs came to learn about these cigarettes, the fact that the operator said that they weren't there initially, the fact that they didn't have the right records, the fact that they were covered in black tarp, and the fact that, you know, when combined all these factors together with the fact that many of the customs agents had not seen this type of thing before and had all pointed toward the fact that there was something suspicious going on amounted to probable cause. And because this is a somewhat regulated area under the Supreme Court's precedent regarding regulatory searches, as long as there's statutory authorization for some sort of search without a warrant, that that's appropriate. And here the CFR 162.11 grants statutory authorization to seize items where customs is lawfully on the premises, which they are here under the FTZ regs, without any sort of warrant, and that the statute that this Court addressed in Mendoza-Ortiz, the 1595 statute, requires a warrant, but requires a warrant when things are – when items are kind of off-site, when they're in private warehouses, off-site, where customs doesn't already have a right to be. So we kind of argued that in the alternative, Your Honor. Kennedy. I might go back a little bit to the California tax. Roberts. Yes. Frankly, it doesn't make common sense to me that the tax is for distribution in California, right? Yes. Okay. And then distribution is counted as being consumption in the State of California, right? Use or consumption, yes. Use or consumption, right. And this is found to be use or consumption because they're holding it to distribute it in Missouri. That's correct. That sure doesn't seem to make common sense to me as to why California can tax for distribution. I think there's a lot to say for the district judge's conclusion that really in all common sense, this is an ad valorem tax because the cigarettes are there. Well, I – let me respond to that in two ways. The first response is that the statutory language regarding the California tax is fairly clear, that it applies to the holding of a – of cigarettes. The use or consumption is defined as the keeping or retention of cigarettes for sale by a licensed distributor. You know, that it exempts licensed distributors, which means it doesn't exempt unlicensed distributors. And that makes sense in light of the California scheme because the California scheme is designed to either require licensed distributors to report the fact that these cigarettes exist, or if you're not a licensed distributor and you're not required to report that the cigarettes are there and open your books up and open everything else up for inspection, if you're an unlicensed distributor, the way that California monitors it is by actually taxing it. So that either way, California either taxes it or it knows what's going to happen with it. So that in either case, these cigarettes are not permitted to move through the State unannounced and unknown to the Board of Equalization. Counsel, to answer the judge's question, you're essentially saying that California has prescriptively defined use to mean possession? I think in the – as for licensed distributors, that the keeping or retention for sale does qualify as that, yes, Your Honor. So you're just saying that any possession by an unlicensed distributor constitutes use? Under the definitions that are set forth, yes. Yes. And the thing is, is this doesn't work in unfairness across the board, Your Honor, because in this case, the taxation, you know, in this case of Intrigue, was easily avoided if Intrigue had put the cigarettes in the possession of NTI, its sister company, which had a license, and which would have then been required to report the fact that these cigarettes were here. But Intrigue didn't do that. I mean, there was an easy way to avoid this issue, in which case it would not seem to be particularly unfair in terms of, you know, the Court's perhaps broader fairness concerns. So you either get taxed if you're unlicensed, or you just have reporting requirements if you're licensed? For possession, as it would be in this case, yes, Your Honor. For holding the cigarettes in California. Yes. Okay. Is there any risk here of double taxation if these cigarettes are taxed in California and then they move to Missouri? Do they get taxed again in Missouri, or? They may be taxed in that particular case. We cited in our brief the TA operational case, a case that came out of Florida that was very similar. Florida imposed a tax on unlicensed, I think, specialized fuel sellers or distributors. And then Georgia imposed a separate tax when that sold the ‑‑ when that gasoline was actually eventually sold. And of course, in that type of circumstance, they're taxing two different transactions, and it's okay in that circumstance to impose double taxation. So there may be some risk of it in this case. But again, this risk was avoidable. That answers my next question. They could simply have had RFI hold them and report them. Right. And the overall California purpose in doing it this way is to ‑‑ I think the California purpose is to ‑‑ the reason ‑‑ the policy behind it is, A, to encourage people to be licensed distributors, and, second, to avoid ‑‑ If they're going to distribute in the State. What's that? If they are going to distribute in the State, in California. In the State or in other ‑‑ I mean, you know, the California legislature, clearly, by the fact that it grants refunds for the sale out of State in some circumstances, indicates that the legislature wanted to reach even cigarettes that moved through the State for sale elsewhere. And again, another way to avoid the tax in this case, I mean, these cigarettes were moved from Florida to California to potentially they were going to go to Missouri. I mean, they could have just been moved directly from Florida to Missouri. Well, let's go back to the intent. All right. The intent, then, is for ‑‑ to tax for any distribution, not just in the State of California? The ‑‑ for use or consumption is defined as the exercise of any right or power over the cigarette's incident to the owner. I'm coming back to the statute because I'm trying to work through it. And I think that ‑‑ from a common sense standpoint, look at this thing, that California wants to tax anyone that's going to distribute cigarettes in the State of California. Right. Are they trying to tax the distribution of cigarettes in another State? I think only if they move through the State and only if that movement is in the hands of an unlicensed distributor. Well, if they move through the ‑‑ so that if any storage of cigarettes in the State that are going to be sold in another State, that that's distribution. Unless it's by a licensed distributor, in which case it falls outside the definition of use or consumption and therefore outside the definition of distribution. And so what you're essentially saying is California is using exposure to a prospective tax as an incentive to be licensed. Yes. I mean, that's essentially the argument? Yes. Okay. And with respect to your other question about the ad valorem tax, I mean, the second issue in this case is whether, even if the tax applies, it's somehow been preempted by the ‑‑ by Section 810E. In the government's position, I mean, we set forth two arguments in our brief, first dealing with the fact that there's a distinction between transshipment and goods destined for domestic consumption. But I think the more immediate and straightforward way to get to the government's position in this case is to recognize that 810E only applies to ad valorem taxes. And ad valorem taxes, for all the reasons for the cases that we've cited in our brief indicate, are taxes that are based on an assessed value of the property. And in this case, the cigarette tax is a flat per cigarette tax, a 6 mils per cigarette. It has nothing to do whether it's the world's highest quality cigarette or the world's lowest quality cigarette. It's 6 mils per cigarette. And by any definition of ad valorem, that is ‑‑ that's not an ad valorem tax. So as a result, it falls outside that definition. The district court in this case said, well, but it's still a tax on possession, and therefore, it kind of amounts to an ad valorem tax anyway. The government's not aware of any tax that can be excised for some purposes and ad valorem for others. I mean, the definition is, is it imposed on the appraised value? And in this case, it's not. Moreover, this Court held 60 years ago in the Mount Tibi Winery case that the possession of an item, in that case, I think it was some sort of brandy, pending sale, is still an excise tax, a tax on that act of possession. And so the fact that, you know, the district court's holding is in conflict with ‑‑ is in conflict with this Court's ruling in the Mount Tibi case, as well as just the general definitions of what it means to be an ad valorem tax. So that's why the government doesn't believe that this preemption, that this preemptive provision applies just simply on its plain language, without even getting to the other issue of whether or not it should apply to the goods which are ‑‑ which already have domestic status and are moving their way into the United States. So unless the Court has any further questions, I'll try to reserve the balance of my time. Great. Thank you. Eric Honig, for Intrigue Trading Company, along with Elon Pollack. Your Honor, I think Intrigue needs to correct some misstatements by the government. First of all, there's no evidence in the record in the statute cited by the government that there's a reporting requirement by Intrigue or NTI to the California Board of Equalization to say, I've got cigarettes here. There's no requirement whatsoever, and they never cited anything. So the fact that they had the cigarettes in the foreign trade zone for a day or a month or whatever, it has no effect at all. There is no requirement whatsoever in the report. The requirement is on the act of distribution, and at that time, right before that can happen, there has to be, if it's in California, there has to be stamps placed on the cigarettes for that act of distribution. So otherwise, the ‑‑ while the cigarettes are sitting in the foreign trade zone, as of the other entity that might be there, it's free to repack the cigarettes, manipulate, for example, is a term of our use, to manufacture or do any other act that they want within the foreign trade zone, and it's essentially a free trade area, a safe harbor for the company to be able to use that site for that process. So there was no requirement for them to announce to the BOV that, oh, we've got cigarettes here. Now, the BOV did come and inspect, and if you saw the excerpts of record presented by Intrigue in this case, BOV knew about cigarettes there and knew that there were unstamped cigarettes in the possession of both NCI and the other entities, which they ‑‑ which was no secret either that NCI and Intrigue and Ampac all were 90 percent owned by Andy Lee. It was his company with his brother who had another 10 percent. It was all essentially one entity, one process that was being operated there. For the purposes of actual stamping and then sale in California, it would be placed in the name of NCI at that moment for that purpose, for the actual distribution. But before that is essentially the company's cigarettes without the formality of actually transferring it into the other name. There's no sale. It was just transferred to NCI so NCI could legally distribute it in California. The ‑‑ So are you saying that you ‑‑ that on your theory that RTI's license extended to Intrigue Trading's cigarettes, that you ‑‑ are you contradicting the fact that you were going to send or you said you had an agreement to send those other cigarettes to Missouri? No, no, no. Not at all. No. I'm not saying that it excused Intrigue from transferring the cigarettes into NCI's possession for the actual distribution. So you were actually intending on putting stamps on those cigarettes? No, no, no. For Missouri, no. I was talking in terms of California. If the cigarettes were going to be sold in California. But if for the sale to go to Missouri, it would have stayed in Intrigue's name and then sold directly to Missouri, I'm sorry, to the company in Missouri who would then have the responsibility of paying the taxes there. Now whether they were going to do it by stamps or just paying taxes directly to the state of Missouri, that was up to the buyer in that case. But no, it would have been sold directly to the company in Missouri. The other thing is that California Board of Equalization had gone to that site, and the facts show it, that they had gone to the sites periodically, every two or three months, and they saw unstamped cigarettes in the possession of the companies on that site. And they actually reported in this page 96 and 97 of the Intrigue's excerpt of record that actually shows the reports there and noting unstamped cigarettes there, and actually warning them, warning the companies not to commingle the unstamped cigarettes with the stamped cigarettes. Well aware that there's unstamped, non-tax-paid cigarettes sitting there. There's no evidence in the record that California ever taxed any of the companies for holding those unstamped cigarettes in there for whatever length of time. Counsel, as I understand the way the matter was presented to the district court, the cigarettes were contraband if, but only if, taxes were owed on them and unpaid. And the trial court took the view that taxes were owed, but the nature of the owed tax was an ad valorem tax specifically excluded. Do you disagree? I disagree. No, the district court did not take the position that taxes were owed. She said the position was that taxes were not owed because at that point, they – there was no distribution. And the effect of the tax would violate the Foreign Trade Zone Act, Section 810 of the Foreign Trades Act, if in fact anyone decided or the California tried to tax them, it would be an illegal tax. Her conclusion was no, no taxes were owed because in the status they were there, just being the mere possession for sale outside of the state, no taxes were owed. So yes, I would disagree with that presumption, Your Honor. In other words, your view is that the trial court did not draw a distinction between ad valorem taxes and excise taxes. Her conclusion was that as a matter of California law, no tax would have been applied to those. Is that your – I think it was a matter of California – actually, it was a matter of federal law under the Foreign Trade Zone Act, 810, that you cannot tax the cigarettes in this type of circumstance. So no taxes are owed in this type of circumstance. All right. But that decision would have been predicated on the characterization of the tax as an ad valorem tax. Correct. Correct. And her conclusion was that the mere fact that cigarettes were sitting there for whatever length of time, I mean, if it sat there for one day, according to the government, California would come in and slap an 87 cents per pack tax on it, even though it was in safe harbor for one day in transit to go to Missouri the next day. Then California could still tax it. And the Court's conclusion was, no, that's an ad valorem tax. There's no distribution. There's no sale. But to characterize a property tax, assuming that that was it, a property tax is an ad valorem tax. That's just a misunderstanding of Latin, isn't it? Well, you can use a Latin term or whatever term you want, but ad valorem is based on the value. Based on value. And the effect of this was the Court saying, you're just holding you just own cigarettes. And you're owning, that's all you're doing is you're owning cigarettes for a day. And that ownership of cigarettes results, according to the government, in being taxed. There's no other act performed. There's no sale. There's no distribution. But the tax wouldn't be measured by the value of the item. It would be a flat tax. Well, but cigarettes, every cigarette has its, has the same value in this case. So by giving a tax of whatever, what was 0.006 cents per mil in that form, it had the effect of taxing the value of the cigarettes, because every cigarette was taxed by that value. By the same, because it's all the same value. So it still had the same effect one way or another. Is there any case authority for the proposition that a property tax is an ad valorem tax? But the cases cited by the government, I think, were, and they're really, that's it. It was the same case law that was applied for both, were actually inaccurate in that way because of the facts of this case. The facts of this case are just totally distinguishable from the rest. I don't understand where, and I know it's not in the record, but this Intrigue Trading purchased these cigarettes from three different companies in Florida. So how can we, some could be of better quality than others. Some could be, you know, I don't know where the cigarettes were from or what, but how can you just assert that they're all the same value? Well. Cigarettes, if you go to the store, they all cost different prices. Right. But these were all Marlboro cigarettes, Your Honor. So Marlboro cigarettes, the Marlboro Lights or Marlboro Red Pack or whatever, they're all Marlboro cigarettes in this case. And assessing a charge per Marlboro cigarette, it didn't have any effect. But even Marlboro cigarettes are priced differently depending on what, you know, I don't, I'm pretty sure about this. My dad, unfortunately, is a smoker, so. I'm not a smoker, Your Honor. I can't answer as far as going out and buying a pack. But you made a assertion, and to support your argument, I was kind of with you up to that point. Well, you know, actually, it brings up an interesting point. By their buying the cigarettes from the seller in Florida and then bringing them here for a day or so. But they weren't here for a day. They were here longer. They were here longer for a day. But according to the government, if they were here for a day, what if, and I think I said in my brief, what if it turned out some of the cigarettes, as the Court suggests, and what if some non-Marlboro cigarettes were mixed in with them, and they had to reject some of those cigarettes and return them to Florida. According to the government, it doesn't matter. The mere holding of those cigarettes for a day in California subjects all the cigarettes to a tax, even if they have to, some of them have to be returned because of inferior quality. I'm sorry. I'm sorry. Well, but only because they were being held by an unlicensed company. Right. And, you know, and this talk about unlicensed versus licensed, I think, is really unfair in this case. Because Intrigue, ANPAC, and NCI had complied with all laws, all federal, all state laws. They were inspected regularly by the Board of Equalization, by Customs, by the Bureau of Alcohol, Tobacco, and Firearms. They paid customs duties, they paid federal taxes, and they paid state taxes. And Bureau of Equalization knew about their operation and never taxed them at any point, at any point, for the unstamped cigarettes. So to characterize them as an unlicensed distributor, I think, is incredibly unfair, considering they're all together working together in the same space. Well, why did you have them, have the separate companies, if you're arguing they're one company? You know. Why did you have one licensed and one not licensed? I mean. Intrigue was licensed in other states. Well, I'm saying in California, which is where the tax applied. I mean, if you're, you know, that argument to me seems to be your worst argument, that it's all one big thing. Right. Because why have the cigarettes held separately? Why have one licensed? There has to be some reason that one was unlicensed as opposed to licensed. The companies were created differently, one for purposes of importing foreign merchandise, another for buying domestic, already imported merchandise and distributing here, and the third for actually distributing in California and some other states. The legal reasoning for dividing them up, I'm not quite sure about that, and it's not in the record, Your Honor. Actually, it is in the record. I think Andy Lee testified at some point as to why they had the three different companies. But as it not being a great argument, Your Honor, the cigarettes were still in the possession of both, of both NTI. I didn't think the district court bought that argument. You know, I don't think she would even need to reach that argument because of the foreign trade zone safe harbor type of argument. So I don't think she really had to take that argument as seriously. You earlier said that the key question the court was concerned with is whether any tax in California was owed. Is that right? Yes, exactly, Your Honor. Not so much that it was whether it was ad valorem or not. If under California law, even though it might not make common sense, but if under California law the tax was owed, then you lose, don't you? It is contraband. Yeah. If you find under the facts of this case that California Bureau of Equalization, in fact, taxed people in these circumstances, which they didn't, and there was a reporting requirement, which there wasn't, and that Intrigue did not intend to sell the cigarettes in Missouri, which they did, if you find all those factors and you feel that Intrigue was going to smuggle these cigarettes or bootleg them, yes, then the taxes were owed. Under California law, as I go through it, it seems that distribution then is ultimately characterized as if it's just there for use. And use is characterized as having any property interest whatsoever there. So under California law, is not the tax, even though it might not be fair, a legitimate tax that's owed? You know, the way it's described is, as the government quoted it, the exercise of any power or privilege or right over the cigarettes. And it's the under-definition to the use, the words use or consumption. Use or consumption implies an act. And the within definition. But they define it then. Right. Within definition is trying to be broad to, I believe, the legislative intent is trying to be broad to define any type of act that would come within use or consumption. Isn't it, I mean, isn't that definition that you just mentioned, the exercise of control over, isn't that the classic definition for possession? Your Honor, if you look at, you go back to use and consumption, use and consumption implies an act. You start with distribution or sale. The definition of distribution is use or consumption. So we're. And use is redefined as exercise of control over, which is the classic definition of possession. Well, no, but control implies the act of doing something with those cigarettes, not merely holding them for, just holding them in your possession for a moment. And that's. But all the people have been convicted of possession of firearms based on the firearm in the car. Well, I think the government was right in saying you should not apply the drug possession definition to this case. And that's what the government said, even though they cited cases to that effect. They said you really shouldn't because it's not. It really is not the same thing we're not talking about. Speaking of cases, how do you distinguish our case of Mount Tybee Winery versus Lewis? Mount Tybee Winery has no application to a foreign trade situation, which is why, which is why we're here in the first place. A foreign trade zone was created for the purposes of protecting domestic, international and domestic trade. And in this case, the intrigue and the others were able to use the foreign trade zone for the purposes of being free from these types of taxes. And Mount Tybee has no application. It may apply to a warehouse that might be out there that doesn't have the foreign trade zone controls or even a bonded warehouse, which is purely a non-domestic merchandise. But when we're talking about a foreign trade zone, I think that's the difference here in this case. So is it your position that California could not lawfully apply a tax on things that are held in the foreign trade zone? Correct, Your Honor. At all? Ever? Unless there's a sale or distribution in California. Unless they're meant for use, consumption, sale, distribution in California. No, they don't have the right to go ahead and start taxing it. And what is your authority for that? The Foreign Trade Zone Act, Your Honor. And that was the section that's applicable here is Section 810. What portion of the Foreign Trade Zone Act? Section 810, Your Honor. Which says? Which says that any user of a foreign trade zone is exempt from taxation when they're keeping items for sale within the foreign trade zone, exempt from an ad valorem type tax. That's what I wanted to get to. Right. Now we're back to the only thing that makes it unlawful is if it's an ad valorem tax, right? Or the effect of an ad valorem tax, yes, Your Honor, which is what we have here. Where does it say the effect of an ad valorem tax? Well, that's the interpretation by the district court that what happened here by merely holding the cigarettes briefly or for whatever length of time has the effect of an ad valorem tax. That isn't in the statute. You know, it doesn't matter what whoever decides to call what the tax, give a label of tax, whether it's Latin or whether it's an English term. A tax is a tax. And if a tax has an effect of being a certain type of tax, then it's that type of tax. Your Honor, there was one other thing that the government talked about, which was the search issue. And intrigue is not contesting that customs did not have the right to enter the foreign trade zone for the purpose of the search. I'm sorry, the purpose of examining merchandise to determine whether it was lawfully imported. What the problem was in this case is they went too far. They learned after examining the merchandise that the merchandise was genuine. It wasn't counterfeit, which was the reason they went in. As soon as they found out that it was genuine, they should have returned the merchandise and let Mr. Lee go back and conduct his business. But instead, they kept searching and searching for other reasons to maybe hold on to the merchandise. They had no basis once they learned that the cigarettes were genuine. That was the reason for the seizure itself of 112 pallets of cigarettes was they were supposedly counterfeit. In fact, the cigarettes said that they, the results, the first test that it was inconclusive that they were counterfeit. So they have no basis to seize the pallets in the first place. Now, going in is one thing, but once they learned that the cigarettes themselves were, were, whether there's no, there was an inconclusive test result, then they should have not seized the cigarettes and taken them away from Mr. Lee in the first place. So beyond that, then... Couldn't they send them off for testing to Marlboro? They, because it was inconclusive, they went ahead and seized it anyway. And then they said, well, we're going to... While they were testing, didn't they find some other problems with the cigarettes? Not while they were testing. While they were waiting for Marlboro to get back to them? No, actually they, it was on April 6th they did the seizure on inconclusive test results. On April 9th, they were told that, in fact, the cigarettes were genuine, that the results were wrong. But they went ahead and sent it to Marlboro anyway to, to get reconfirmation of that. And, but they didn't, they waited actually another eight days before sending it off to Marlboro. During that time period, they started looking for possible more violations. And that's when they found, you know, supposed import violations, which they eventually dropped in this case also. So, you know, we're talking about a person who's trying to conduct business. As soon as they knew, and they had results on April 9th, that the, the cigarettes were, in fact, the test results were wrong, then they should have given the cigarettes back to, to Mr. Lee. It wasn't that just one day apart? It wasn't... Well, actually, the tests were inconclusive on the 6th. There's some testimony by Eileen Salaveras from Customs that says on the 6th, she learned that they were, in fact, genuine. Then she corrected her testimony later in the deposition and said, well, I didn't find out until the 9th that they were genuine. But they started the inventory later that day and didn't find any potential violations until the 10th, the next day. So as of the 9th, they had no basis to hold on those cigarettes. And it should have been, it should have been returned and let, and let Mr. Lee go on and conduct his business. So, and then the 10th, they find what they considered import violations, not counterfeit, not tax-related or whatever, but it wasn't until a day later that they thought that they had found some violations. And then they waited still another week before sending it off to Philip Morris, presumably because they knew the results were going to be confirmed that they were, in fact, genuine, and they waited for that. And so they had no basis to do that, which leads us to the evidence that they found to file the lawsuit in the first place, because the inventory led them to file the lawsuit on the import violations. And then they didn't amend the complaint until another year later than that. After discovery and having Mr. Lee admit in discovery that no California cigarette taxes were paid, they didn't get that statement until through the whole process of discovery. So if the Court finds that on the 9th, when they knew the cigarettes were genuine, they should have returned them instead of going and inventorying them that afternoon and the next day, that all those, that statement would be suppressed and we shouldn't be here in the first place. Thank you, Your Honor. Just a few matters to clarify, unless the Court has any additional questions. With respect to the order of events, with respect to the motion to suppress, the cigarettes were, in fact, seized on the 6th, based on the factors that I enumerated before, plus the fact that there were three different, there were field tests that were conducted that day, and those field tests came back with one of three results, either that the cigarettes were counterfeit, that they were likely counterfeit, or that they were possibly counterfeit. And on the basis of the initial suspicion that they had, plus the additional suspicion for the field test, they seized 112 pallets of cigarettes. The next week, because that was on a Friday, April 6th, on Monday, April 9th, they actually sent the cigarettes, a sampling of the cigarettes, to Customs Lab, and the lab report was conducted on that day. And that lab report indicated there was some indicia, and it's on pages 23, 22 and 23 of Intrigue's excerpt of record. The lab report indicated that there were some indicia that these cigarettes were genuine and that there were some indicia where they were unclear whether they were genuine or not, which is why they felt that ultimately the test was inconclusive and they needed to send the cigarettes to Philip Morris, the manufacturer, to determine whether they were legitimate cigarettes that were manufactured over in Europe. And the fact that they were inconclusive, that there was an inconclusive test result, did not, in the government's view, dispel the probable cause in this case, particularly given the nature of the items here. Customs had reason to believe, in probable cause, that these items were counterfeit. And oftentimes counterfeit cigarettes look a lot like the real thing. So the fact that these cigarettes looked a lot like the real thing did not, they may not have been exactly the same, but the fact that they looked a lot like them didn't dispel the probable cause or in any way negate the initial reasons they had regarding the fact that they were covered in tarp, that no one knew that they were there. All that continued to persist all the way until such time as Customs gained additional reasons to hold on to these things on April 10th. And that's why when Philip Morris ultimately determined that they were genuine the next week, Customs still had a reason to hold on to them. I have a question from Mr. Honig's argument. He kept saying that there were no reporting requirements for the licensed distributors. What requirements were there? The two requirements that are set forth in statute in the California Tax and Revenue Code, they're in the appendix to the government's opening brief. Section 3182 and 3454, both of those sections have reporting requirements, like monthly reporting requirements and additional requirements that the companies, the licensed distributors open their books. Moreover, if you look at Excerpt of Record 100-104, those are the various reports that the Bureau of Equalization wrote up for NTI. And all of those reports, they stop about six months, maybe five months before the events at issue here. But they do show that the Board of Equalization is looking at the cigarettes. Reporting requirements by whom? By the licensed distributor. Okay. Well, we have an unlicensed distributor here. Right. Which is why, that's why California has imposed its, you know, it's basically its taxation requirement. But there is no reporting requirements on behalf of an unlicensed distributor, right? Right. Because the Board of Equalization would get a report and say, who is this? We don't even know, you know, we don't know who this person is. And that's why the purpose is to get people to become licensed so they can monitor them and to avoid any sort of smuggling problem with people moving cigarettes through the State without the Board of Equalization knowing about it. But there is no, I guess the point I'm getting to is there is no violation on the part of Intrigue here for failing to report. There's no violation of a reporting requirement, but under the statutes, they're liable for the tax because they're not licensed. Now, let's talk about reporting. Right. Yeah. There is no violation for? None of the reporting requirements because, again, those apply only to the licensed distributors. Can you just either say yes or no? I want to make sure I answer the right question, yes or no. Right. If there is no reporting requirement on behalf of an unlicensed distributor. That is correct. Okay. Okay. And just very briefly otherwise, I wanted to say, again, we cited a couple of cases the Costain-Cole case, the LTV-Steele case. Both of those involved flat rate taxes that are exactly like the cigarette taxes in this case. And both of those courts held that in that circumstance, it's not an ad valorem tax. I also point the Court to the Continental Motors case that we cited for the fact that a tax on possessory rights is an excise tax, not an ad valorem tax. And for that reason, we think that the cigarette taxation in this case was not preempted by the Federal law and is subject to the State law based on the plain reading of the State statutes and, therefore, that the seizure was appropriate and summary judgment should be reversed. Does the Court have any further questions? No. Okay. No.  Thank you very much, Counsel. Thank you, Your Honor.
judges: Hug, Wardlaw, Singleton